UNITED STATES OF AMERICA
DISTRICT OF MASSACHUSETTS

_____
                                      )
UNITED STATES OF AMERICA,  )
                                      )
v.                                    )          Criminal No. 05-10239-RCL
                                      )
ALBERTO ROMERO,          )
                    Defendant    )
_____)

### MEMORANDUM ORDER ON MOTION TO SUPPRESS EVIDENCE

Before the court is a motion of the defendant, Alberto Romero, to suppress all evidence

gathered against him by means of authorized, electronic interceptions of communications on a

Nextel direct-connect cellular telephone subscribed to and used by him during the summer of

2005.  Romero is named in an indictment as co-defendant with at least seventeen others and

charged with conspiring to manufacture and distribute crack cocaine, in violation of 21 U.S.C. §

846.  The present motion is accompanied by a request for an evidentiary hearing, pursuant to

*Franks v. Delaware*, 438 U.S. 154 (1978).  The interceptions from which the evidence sought to

be suppressed was derived were authorized by a judge of this court on July 8, 2005, acting under

authority granted by Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("Title

III").

Romero argues that the evidence should be suppressed because (1) the affidavit of Drug

Task Force Agent, Joao J. Monteiro, dated and submitted to the court on July 8, 2005, in support

of the application for the interceptions ("Supporting Affidavit"), did not establish that the

necessity requirement of Title III, 18 U.S.C. §§ 2518 (1)(c), had been met; (2) Title III does not

authorize the interception of direct-connect telephones; (3) Agent Monteiro was not authorized to

apply for the Title III interception; (4) the interceptions were not minimized as required; (5) the

Supporting Affidavit contained false statements or statements made in reckless disregard of the

truth; and (6) the Supporting Affidavit did not demonstrate probable cause justifying the

authorization of the interceptions.

After a thorough review of the extensive record and the papers submitted by the parties, I

make the rulings below.  In making these rulings, I am mindful, as I have said, that the

interceptions now at issue were authorized by an order of a judge of this court, and that the

present motion requires that I review that order.  Such a review is to be undertaken, not as I

might have determined the matter in the first instance, but under a deferential standard that

requires that I "examine the face of the [Supporting Affidavit] and decide if the facts set forth in

the application were minimally adequate to support the determination that was made." *United*

*States v. Villarman-Oviedo,* 325 F.3d 1, 9 (1st Cir. 2003) (quoting *United States v. Ashley*, 876

F.2d 1069, 1073-74 (1st Cir. 1989)); *United States v. Lopez*, No. 05-10304-GAO, 2007 WL

4556904, *3 (D. Mass. Dec. 12, 2007) (slip opinion). That means, among other things, that I

must examine the Supporting Affidavit in light of the totality of the circumstances stated in the

affidavit and "in a practical, common-sense fashion[,] . . . [that accords] considerable deference to

the reasonable inferences the [issuing judicial officer] may have drawn from the attested facts."

*United States v. Beckett*, 321 F.3d 26, 31 (1st Cir. 2003) (citation and internal quotation marks

omitted).

1. **The Need for a Franks Hearing**

Romero bases his request for a *Franks* hearing primarily on his contention that the

Supporting Affidavit contained false statements, knowingly made, or statements that were made

2

with reckless disregard of the truth, and that, without those statements, the Supporting Affidavit does not establish probable cause for the Title III interception of communications on his telephone.  The Supporting Affidavit, of course, is presumed to be valid.  *Franks,* 438 U.S. at 171; *United States v. Valerio,* 48 F.3d 58, 62 (1st Cir. 1995).  Thus, to secure a *Franks* hearing, Romero is required to make a substantial preliminary showing supporting his allegations that the Supporting Affidavit contained misrepresentations of fact, and that those misrepresentations were necessary to a finding of probable cause justifying the Title III interceptions.  *Franks*, 438 U. S. at 155-56, 170-72.  For the reasons discussed below, I find that the required showing has not been made, and that no *Franks* hearing is needed for the disposition of the present motion.

2.  **Necessity Requirement**

Romero's first claim is that the Supporting Affidavit failed to demonstrate that a wiretap on his telephone was necessary to the investigation that led to his arrest.  Title III requires that an application for interception of telephonic communications provide "a full and complete statement as to whether or not other investigative procedures have been tried and failed, or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous . . . . "  18 U.S.C. § 2518(1)(c).  Thus, the affidavit submitted in support of the application must "show why wiretaping is necessary in place of less intrusive investigative techniques."  *Villarman-Oviedo,* 325 F. 3d at 10.  Specifically, the government must establish that it has made "a reasonable, good faith effort to run the gamut of normal investigative procedures before resorting to means so intrusive as electronic interception of telephone calls."  *Id.* at 9 (quoting *United States v. Hoffman,* 832 F. 2d 1299, 1306-07 (1st Cir. 1987)).  And before granting authority for the interception of telephonic communications, the issuing court "must satisfy itself that the

3

government has used normal techniques but it has encountered difficulties in penetrating a

criminal enterprise or in gathering evidence– to the point where (given the statutory preference

for less intrusive techniques) wiretapping becomes reasonable." *Villarman-Oviedo,* 325 F.3d at 9

(quoting *United States v. Abou-Saada*, 785 F.2d 1, 11 (1st Cir. 1986).  On the other hand, it is

not a necessary predicate for a valid order that the government "show that other methods [of

investigation] have been entirely unsuccessful."  *Id.*

       The Supporting Affidavit met the necessity requirement.  It recounted the many

investigative techniques previously employed by investigating officers and agencies and explained

why others were not feasible.  The affiant, Agent Monterio, noted that the DEA and other law

enforcement agencies had: (1) used cooperating sources (called "confidential sources of

information" or "SOI's"), (2) conducted physical surveillance, (3) interviewed potential witnesses,

(4) analyzed telephone toll records and data from pen register/trap and trace devices, (5) made

undercover and controlled purchases of illicit drugs, and (6) used grand jury subpoenas for

financial records.  He explained in detail the activities of law enforcement officers in each of these

categories.  Supporting Affidavit, pp. 47-56.[1]  He also explained why these investigative

techniques and others not used, but considered, were inadequate "to determine the full nature and

scope of the criminal conspiracy, the identities of all the participants, and the full method of

operation."  *Id.*  In particular, Agent Monteiro stated in the Supporting Affidavit that, despite the

---

[1]  In citing to specific portions of the Supporting Affidavit in this memorandum and order,
I sometimes provide page numbers of the document and, at other times, specific paragraphs of the
document.  I would have preferred consistently to cite to paragraph numbers.  However,  I must
sometimes cite to page numbers of the Supporting Affidavit, because the document is mis-
numbered after the paragraph numbered 99.  The numbered paragraph that follows numbered
paragraph 99 is a second paragraph numbered 59.

use of these investigative techniques and electronic interceptions of telephone communications of

other persons believed to be members of the alleged conspiracy to traffic in control substances,

law enforcement officers had not been able to (1) determine the sources of supply of two persons

who ultimately became co-defendants in this case, Gregory Bing and Husie Joyner; (2) determine

the sources of supply for Romero and his brother, Jorge Romero; (3) definitively determine the

identity and whereabouts of one "Willie," a person frequently overheard, in previously authorized

wiretaps, to be engaging in alleged drug transactions with Romero and targets of previously-

authorized wiretaps.  *Id* at p.48

I have no difficulty in finding the foregoing information to be at least minimally adequate

to support the determination, implicitly made by the issuing judge, that the necessity requirement

had been met.  *See United States v. Yeje-Cabrera*, 430 F.3d 1, 8 (1st Cir. 2005) (noting that the

"determination of necessity is properly committed to the issuing judge in the first instance," and

that the sufficiency of the affidavit should be upheld so long as the issuing judge could reasonably

have concluded that normal investigative measures would not likely be successful in achieving the

objects of the investigation).

### 3.  **Interception of Communications on Direct-Connect Telephone**

The interceptions now at issue were of communications that occurred on Romero's direct-

connect Nextel telephone.  He argues that interception of communications on such a device is

prohibited by 18 U.S.C. § 2511(2)(g).  That section provides, in pertinent part, that:

> It shall not be unlawful under this chapter or chapter 121 of this
> title for any person - -
>
> (I)     to intercept or access an electronic
>         communication made through an electronic

5

> communication system configured so that
> such electronic communication is readily
> accessible to the general public; . . . .

Romero's argument is that this section makes lawful the interception of only those communications made by means of an electronic communication system so configured that the electronic systems is "readily accessible to the general public."  Because communications over a direct-connect telephone system are not readily accessible to the general public, so the argument goes, interception of them is forbidden by the general prohibition of the interception or disclosure of wire, oral, or electronic communications set forth in 18 U.S.C. § 2511(1).

The flaw in Romero's argument is that § 2511(1) generally makes the interception or disclosure of wire, oral or electronic communications an offense against the United States, *except* as "otherwise specifically provided in this chapter."  One of the exceptions is that set out in § 2511(2)(g) - - the one on which Romero relies for the present argument.  Another exception to the criminalizing of the interception of wire or electronic communications, however, is that found in 18 U.S.C. § 2516, which specifically authorizes the Attorney General and certain other officials to seek, and federal judges to grant, authorization for the interception of wire or oral communications in connection with certain offenses against the United States, including the offenses charged in this case.  Section 2516 does not impose a limit on the kind of device for which approval may be sought or granted.

In this case, an appropriate official of the Justice Department authorized the application to intercept communications on Romero's direct-connect telephone and a judge of this court granted that application.  Romero's prohibition argument is therefore without merit.

4.  **Authority of Agent Monterio to Seek the Title III Interceptions**

Romero argues that Agent Monterio, as an officer of the Boston Housing Authority Police, did not have authority to apply for the Title III interception.  This argument is easily dispatched.  The applicant for the interception was not Agent Monterio, but rather Assistant United States Attorney Neil Gallagher.  In his application for the Title III interception, AUSA Gallagher pointed out that, as an assistant United States Attorney, he was authorized by 18 U.S.C. § 2516 (3) and Fed. R. Crim. P. 54 (c) (now Fed. R. Crim. P. 1 (b)) to apply for an order authorizing the interception of electronic communications.  No question has been raised by Romero about AUSA Gallagher's authority to apply for the order.

As for Agent Monteiro's role, as I pointed out earlier, he supplied the Supporting Affidavit.  See 18 U.S.C. § 2518(1)(b)-(f) (explaining the matters that must be addressed in support of the application).  In that affidavit, he pointed out that he was deputized by the Drug Enforcement Administration as a federal officer, pursuant to 21 U.S.C. § 878, and thus was "an investigative officer of the United States," within the meaning of 18 U.S.C. § 2510 (7), and empowered to conduct investigations and make arrests of persons for violating the drug laws of the United States.  Supporting Affidavit, ¶1.

I find that there is no flaw in the application for the Title III order at issue that is attributable to Agent Monteiro's role in the application process.

5.  **Minimization**

Although the defendant asserts that "the warrant is facially invalid because federal agents did not minimize the interception of non-relevant conversations," the memorandum supporting this claim does not identify any incident in which the minimization requirement of 18 U.S.C. §

2518(5) was not met.  There is, therefore, no basis for me to conclude that evidence should be suppressed, because the agents did not limit their interception to communications having to do with potential violations of federal drug laws.  *See United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones. . . . Judges are not expected to be mind readers.  Consequently a litigant has an obligation to spell out [his] arguments squarely and distinctly, or else forever hold [his] peace." (citation and internal quotation marks omitted).

### 6.  **Probable Cause**

Romero's most important argument is that the Supporting Affidavit contained statements that were knowingly false or that were made with reckless disregard for the truth.  He further argues that the Supporting Affidavit was misleading because it misquoted and strategically elided information derived from communications intercepted pursuant to previous orders of the judge who issued the order this is now contested.

Specifically, Romero claims that Agent Monteiro, in the Supporting Affidavit, intentionally or, at the very least, recklessly misidentified one "Willie" (mentioned earlier in this memorandum and order) as Romero's brother, Jorge Romero.  Romero claims further that excerpts from the transcripts of at least two conversations on May 31, 2005 between him and Willie, quoted in the Supporting Affidavit, were selectively edited to make innocent discussions appear to be discussions related to drug-trafficking.  According to the Supporting Affidavit, Willie had been identified by an SOI as Romero's cocaine deliveryman.  Affidavit of Joao Monteiro,

June 17, 2005,[2] ("June 17 Affidavit), ¶40.  Willie had been the target of physical surveillance; his

telephone toll records strongly suggested to the investigating officers that he was engaged in

drug-dealing; he had been overheard in intercepted communications with one or another of

Romero's co-defendants and others pertaining to alleged drug-trafficking, and he had

been discussed in intercepted communications about alleged drug trafficking among some of the

co-defendants and others.  Supporting Affidavit, *passim*.

    As for the misidentification of Willie as Jorge Romero, I do not find that Romero has

made a showing sufficient to justify a *Franks* hearing that the misidentification was intentionally

false or made in reckless disregard of the truth.   In the May 11 Affidavit, Agent Monteiro

identified Willie as a "target subject."  May 11 Affidavit ¶19.  It was clear then that the agent did

not know the precise identity of Willie, because he introduced Willie as "an unidentified Hispanic

male," "FNU LNU [first name unknown, last name unknown] , a. k. a. Willie, , a. k. a.  Inocente

Quijada."  He thereafter referred to Willie as "Quijada," initially enclosing each reference to the

name in quotation marks.  *Id.*  In the May 25 Affidavit, Agent Monteiro identified Willie in

virtually the same way as he had in the May 11 Affidavit, indicating that Willie's first and last

names were unknown, and that he was also known as Inocente Quijada.  May 25, Affidavit, ¶5.

In the June 17 Affidavit, Agent Monteiro stated that he had "tentatively identified" Willie as Jorge

Romero "[b]ased on physical surveillance and intercepted calls." June 17 Affidavit, ¶17.  Finally,

---

[2] The Supporting Affidavit attached, incorporated by reference, and relied upon a number
of affidavits of Agent Monteiro submitted in support of previous applications for wiretaps in the
investigation that led to the arrest and prosecution of Romero.  In addition to the June 17
Affidavit, the incorporated affidavits were dated April 19, 2005 (the "April 19 Affidavit"); May
11, 2005 (the "May 11 Affidavit"); May 20, 2005 (the "May 20 Affidavit"); and May 25, 2005
(the "May 25 Affidavit").  Supporting Affidavit ¶¶13, 17.

in the Supporting Affidavit, Agent Monteiro indicated again that he had "tentatively identified"

Willie as Jorge Romero.  Supporting Affidavit, ¶93.  On the other hand, however, the agent gave

as one of the reasons for the application for what became the July 8, 2005 interception order, the

inability of law enforcement officers involved in the investigation definitively to identify Willie,

whom Agent Monteiro said was "*believed* to be Jorge Romero"  Supporting Affidavit, ¶97.

(emphasis added)

      The foregoing recitation of statements made about Willie in the Supporting Affidavit

shows that, at worst, the tentative identification of Willie as Jorge Romero was a mistake, not an

intentional or reckless act.  The judge who issued the order to intercept communications on

Romero's telephone thus had no reason to believe anything other than that Agent Monteiro had

made a tentative identification of Willie, but was unable to confirm or revise that tentative

identification without a wiretap on Romero's telephone.  The face of the Supporting Affidavit

reveals nothing sinister about the tentative misidentification of Willie, and as the government

argues, there was no particular benefit to the government from the tentative misidentification.

The Supporting Affidavit makes clear that the investigating officers were interested in finding out

as much as they could about Willie, "his whereabouts [and] the details of his drug trafficking

activities [particularly details relating to whether he was a source of supply to Husie Joyner],"

regardless of whether he had any blood relationship to Romero.  Supporting Affidavit, ¶¶15, 97.

      I find no basis, therefore, in the tentative misidentification of Willie as Jorge Romero to

suppress evidence gathered from the interception of communications on Romero's telephone.

      That brings me to the question of the claimed selective editing of the transcript of the May

31, 2005 communications between Romero and Willie.  Romero claims that intentional, selective

editing, together with Agent Monteiro's interpretation, in light of his "training and experience," made innocent conversations about automobile wheels appear to be conversations about drug trafficking.

After reviewing both Romero's and the government's translations of the conversation in question, I conclude that the portion of the transcript included in the Supporting Affidavit was, at the least, an overstatement of the degree of certainty with which Agent Monteiro could reasonably have interpreted the conversation to be one concerning drug transactions.  The conversations appear to be, in fact, about chrome wheels for an automobile, the wheels being sold under the brand name "Lowenhart."

The government, in its brief in opposition to the present motion, argues that Agent Monteiro, in quoting the conversation, made, at worst, an innocent error.  The government explains that Agent Monteiro did not monitor or translate the May 31, 2005 calls from Spanish to English:  the monitoring and translation were done by a government contract interpreter.  Neither Agent Monteiro nor any of the other officers engaged in the investigation spoke Spanish, the government says.  The government adds that the quotation at issue came directly from an edited, summary line sheet from which there was no mention of the important words "Lowenhart," "wheels," or "chrome."  United States' Omnibus Opposition to Defendants' Motion to Suppress Evidence and for a *Frank*s Hearing at 54-55.

The problem with the government's explanation is that it is based on information outside the four corners of the Supporting Affidavit.  On the other hand, by presenting the full transcript of the conversations in question, Romero has made the showing necessary to justify a *Franks* hearing, unless the Supporting Affidavit contains other indicia of probable cause justifying the

issue of the interception order.  I therefore will disregard the May 31, 2005 intercepted

conversations.  I will examine the other information in the Supporting Affidavit to see whether,

without the questioned conversations, the Supporting Affidavit fails to provide probable cause for

the order authorizing the interception, or whether, at minimum, a *Franks* hearing is required to

determine whether the order is valid without the questioned conversations.  *See Reiner v. United*

*States*, 500 F.3d 10, 14 (1st Cir. 2007) ( noting that " [i]n the case of an omission, suppression

should be ordered only if the warrant application, . . . clarified by disclosure of previously

withheld material, no longer demonstrates probable cause") (deleted material in original) (internal

quotation marks and citation omitted); *see also United States v. Stewart*, 337 F.3d 103, 106-07

(1st Cir. 2003) (determining that an affidavit supporting an application for a search warrant

demonstrated probable cause even if four reckless omissions and one intentional omission had

been included).

The Supporting Affidavit identifies an SOI, who is said to have told the investigating law

enforcement officers that he was the best friend of Romero's younger brother, Quiryco Romero,

who was murdered in 2003.  Supporting Affidavit, ¶¶50-51.  According to the Supporting

Affidavit, the SOI reported that Romero was a dealer in cocaine at the level of ten to fifteen

kilograms per week.  June 17 Affidavit, ¶40.  The Supporting Affidavit goes on to say that the

SOI advised that Willie was Romero's cocaine deliveryman to co-defendant, Husie Joyner.  *Id.*

The Supporting Affidavit warned the issuing judge, however,  that the SOI was no longer

being used, because he had not been completely truthful in providing information about other

drug dealers.  Supporting Affidavit, ¶51.  Still, the Supporting Affidavit showed that law

enforcement officers were able to corroborate, through previous wiretaps, physical surveillance,

other human sources, and otherwise, many of the details the SOI gave them concerning Romero, including, among other things, his association with Willie; his association with another drug dealer, José González-Padilla; the description of the vehicles driven by Willie and Romero, and a physical description of each of the two of them.  Supporting Affidavit, *passim*.

The Supporting Affidavit also was based on information said to have been provided by co-defendant Gregory Bing, who, as described in the May 20 Affidavit, and the April 19 Affidavit, had given information to law enforcement officers to the effect that Romero was a large-scale drug dealer.  Supporting Affidavit, p. 36 n.12; May 20 Affidavit, ¶47; April 17 Affidavit, ¶¶35-36. The Supporting Affidavit, by reference to the April 19 Affidavit, plainly set forth an important caveat to the reliability of Bing's information.  Bing's reports to law enforcement officers about the criminal activities of others (including drug-trafficking) failed to include any information about Bing's own unauthorized criminal activities and the activities of his long-time friend and now co-defendant, Husie Joyner.  April 19 Affidavit, ¶¶35-36.  It appears that Agent Monteiro trusted the information he received from Bing regarding Romero, however, because the agent surmised that Bing provided information on activities of others because he wanted to (1) eliminate competitors in the drug-trafficking business; (2) make it less likely that he would be a target of investigative and prosecutorial efforts for his own criminal activities; (3) use his cooperation to gather intelligence concerning whether he was a target of law enforcement efforts and, if so, to put himself in position to offer fuller cooperation in exchange for prosecutorial leniency in his own matters.  *Id.,* ¶36.

Bing's failure to be completely truthful about his own activities and the fact that he was engaged in unauthorized criminal activity while informing on others are factors that call into

question his reliability as an informant.  On the other hand, the information Bing supplied

regarding the nature of Romero's drug-dealing, given independently of the information obtained

from the SOI, both corroborates the information provided by the SOI and is corroborated by that

information.

The Supporting Affidavit also points to the following incident as support of the

application in question.  On May 6, 2005, officers of the Boston Police Department seized $5,000

in alleged drug proceeds from José González-Padilla.  Supporting Affidavit, ¶¶23-24.

Interceptions authorized by previous orders revealed that the participants in the transaction that

produced the $5,000 were Willie, Joyner, and Bing.  Supporting Affidavit ¶¶19-33; May 25

Affidavit, ¶¶ 21-31.  Certain of those interceptions also revealed that Romero was engaged in

efforts to recover the seized $5,000.  *Id.*  Romero thus was linked to Willie, González-Padilla,

Bing, and Joyner in at least one alleged, specific drug transaction among them.

The Supporting Affidavit also summarized an intercepted conversation between Joyner

and Bing in which the two discussed "a case [Romero] had involving the Boston Police and a

'four kilo deal.'" Supporting Affidavit, ¶33.  The Supporting Affidavit explained the reference to

the "four kilo deal" as pertaining to the discovery of four kilograms of cocaine on the person of

Romero and in his car when he was stopped and frisked and his car subsequently searched by

Boston Police Officers on February 9, 2004.  *Id.,* ¶48.  The Supporting Affidavit noted that the

prosecution of Romero for distribution of cocaine, growing out of the February 9, 2004 incident,

was abandoned following the Romero's success on a motion filed in Suffolk Superior Court to

suppress the drugs that the officers seized on February 9, 2004.  Id., ¶ 49 n. 9.

The Supporting Affidavit also provided information derived from pen registers and

telephone toll records showing communications between Romero and telephones subscribed to by

persons who had been previously arrested for drug offenses. *Id., ¶¶* 79-88.

I find that the information from the Supporting Affidavit, as described in the preceding several paragraphs, amply provided the issuing judge with a basis on which to find probable cause to authorize the interception of communications on Romero's direct-connect telephone, even in the absence of the questioned, intercepted conversations between Romero and Willie on May 31, 2005.

Conclusion

Having considered all the claims made by Romero, I hold that he is not entitled to a *Franks* hearing on any of his claims, and that his motion to suppress evidence seized pursuant to the interception order is denied.

                                        /s/ REGINALD C. LINDSAY
                                        United States District Judge

Dated: March 7, 2008